```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
JERRY I. TREPPEL,                 :  03 Civ. 3002 (PKL) (JCF)
                                  :
            Plaintiff,            :     MEMORANDUM
                                  :     AND   ORDER
    - against -                   :
                                  :
BIOVAIL CORPORATION, EUGENE N.    :
MELNYK, KENNETH C. CANCELLARA,    :
MICHAEL S. SITRICK, and SITRICK   :
AND COMPANY, INC.,                :
                                  :
            Defendants.           :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

As discussed in several prior decisions, this case concerns a vendetta between plaintiff Jerry I. Treppel, a securities analyst who claims that his career was destroyed by a smear campaign engineered by the defendants, and Eugene N. Melnyk, the Chairman and Chief Executive Officer of Biovail Corporation ("Biovail"), who contends that Mr. Treppel published false information that defamed him and caused the stock of Biovail to plunge. After two rounds of motions to dismiss, the plaintiff's surviving claims include defamation, tortious interference with prospective economic advantage, and civil conspiracy. Now that the parties have completed discovery, the plaintiff moves to compel the production of additional electronically stored information ("ESI") and to sanction the defendants for failing to preserve evidence. For the reasons described below, the motion is granted in part and denied in part.

Background[1]

Prior to the events that gave rise to this litigation, Mr. Treppel was a securities research analyst who reported on the healthcare and pharmaceutical industries for Banc of America Securities ("BAS") and other securities firms. Two of the companies that he routinely analyzed were Biovail and its competitor, Andrx Corporation ("Andrx"). In 1993, Mr. Treppel acquired 24,000 shares of Andrx stock. He claims that he fulfilled all reporting obligations with respect to that investment and held the stock in a managed account so that he could not direct or control its trading.

In October 2000 and again in January 2002, Mr. Treppel downgraded his recommendation for Biovail. This resulted in substantial declines in its stock value. According to Mr. Treppel, Biovail responded by retaining media consultants Michael S. Sitrick and Sitrick and Company to engineer a campaign to sully his reputation as an analyst. As part of this campaign, the defendants obtained Mr. Treppel's personal account statements by taking allegedly improper discovery of BAS, a nonparty to this litigation,

---

[1] The factual and procedural history of this case is discussed at length in four prior opinions. See Treppel v. Biovail Corp., 233 F.R.D. 363 (S.D.N.Y. 2006) ("Treppel IV"); Treppel v. Biovail Corp., No. 03 Civ. 3002, 2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005) ("Treppel III"); Treppel v. Biovail Corp., No. 03 Civ. 3002, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005) ("Treppel II"); Treppel v. Biovail Corp., No. 03 Civ. 3002, 2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004) ("Treppel I").

in a lawsuit in Florida.

On April 29, 2002, Mr. Treppel issued a report and made public comments that were critical of Biovail and its management; he also further downgraded his recommendation for the company. Immediately thereafter, Biovail's stock declined in value by more than twenty percent, resulting in substantial personal losses for Mr. Melnyk, who owned eighteen percent of the company's outstanding shares. There then followed a series of conference calls between Biovail executives, including Mr. Melnyk, and executives from BAS; the most significant appears to have taken place on May 13, 2002. (Notes from teleconference call of May 13, 2002, attached as Exh. A to Affirmation of James A. Batson dated Feb. 5, 2008 ("Batson Aff.")). After Biovail executives were unable to persuade BAS to retract the April 2000 report, Mr. Treppel alleges that the defendants retaliated against him by providing his personal account statements to the Wall Street Journal and falsely telling the press that he had traded Andrx shares to coincide with the issuance of his recommendations, thus illegally profiting from his own reports. The information appeared in a Wall Street Journal article shortly thereafter. (Laurie P. Cohen & Randall Smith "Buy Analyst Profits on Andrx Trades," Wall St. J., May 16, 2002, at C4, attached as Exh. C to Batson Aff.). According to Mr. Treppel, the defendants made some eleven defamatory statements about him, including assertions that he was biased against Biovail because of a conflict

of interest in relation to Andrx, that he had concealed his stock holdings in Andrx while reporting on Biovail, and that he had engaged in unlawful conduct by purportedly profiting from his recommendations concerning both Andrx and Biovail.

As a result of these statements having been circulated in the press, Mr. Treppel was investigated by the New York State Attorney General's Office, the Securities and Exchange Commission, and the National Association of Securities Dealers.  In addition, Mr. Treppel alleges that in May 2002 the defendants pressured BAS into placing him on leave and ultimately forcing him to resign.

Mr. Treppel commenced this action on April 29, 2003.  He did not effect service of the initial complaint, however, and instead served an amended complaint in August 2003.  Nonetheless, Kenneth Cancellara, Biovail's General Counsel, testified that "shortly after" Biovail learned that Mr. Treppel had instituted an action, presumably sometime in May 2003, he orally instructed Mr. Melnyk and Kenneth Howling (Biovail's Vice President of Finance and Corporate Affairs at the time) to preserve relevant information. (Excerpts of Deposition of Kenneth Cancellara dated Sept. 28, 2007 ("Cancellara Dep."), attached as Exh. 1 to Declaration of Shalom Doron dated Feb. 21, 2008 ("Doron Decl.") and as Exh. B to Affirmation of Christine A. Palmieri dated March 3, 2008 ("Palmieri

Aff."), at 288).[2]  No instructions were issued in writing, nor did Mr. Cancellara follow up with either Mr. Melnyk or Mr. Howling as to what actions they had taken to preserve relevant materials. (Cancellara Dep. at 288-89).  Mr. Howling recalled being instructed to preserve relevant documents, but could not remember with any specificity when that instruction was given.  (Excerpts of Deposition of Kenneth Howling dated March 7, 2007 ("Howling Dep."), attached as Exh. 2 to Doron Decl., at 23).  In response to Mr. Cancellara's instruction, Mr. Howling directed his staff to preserve documents related to the Treppel litigation.  (Howling Dep. at 23-25).  Mr. Melnyk did not recall the instruction from Mr. Cancellara at all.  Rather, he remembered preserving relevant documents upon learning of an investigation by the Ontario Securities Commission, though he could not recall when that investigation began.  (Excerpts of Deposition of Eugene N. Melnyk dated Sept. 6, 2007 ("Melnyk Dep."), attached as Exh. K to Batson Aff. and as Exh. 3 to Doron Decl., at 74-77).  Mr. Melnyk also remembered being advised in writing in December 2003 to preserve relevant e-mail; he had already begun to do so by that time. (Melnyk Dep. at 92-93, 102-05).  Mr. Cancellara also took steps to preserve relevant files on his own system, namely by "not

---

[2] Mr. Cancellara declined to discuss the precise content of his instructions to Mr. Melnyk and Mr. Howling on grounds of attorney-client privilege.  Thus, it is unclear what specific materials, if any, the two were instructed to save.

delet[ing] anything." (Cancellara Dep. at 293). No instructions were given to Biovail's Information Technology ("IT") department prior to December 2003. (Cancellara Dep. at 299-300; Excerpts of Deposition of Tien Nguyen dated July 25, 2007 ("Nguyen Dep."), attached as Exh. F to Batson Aff. and as Exh. 4 to Doron Decl., at 19).

On December 3, 2003, Mr. Treppel's counsel sent a letter to counsel for Biovail demanding that it preserve all information, including ESI, relevant to the claims and defenses in the action. (Letter of R. Scott Garley dated Dec. 3, 2003, attached as Exh. D. to Batson Aff.). At this point, Mr. Cancellara apparently repeated his instructions to Mr. Melnyk and Mr. Howling, and learned that they had "taken steps to preserve." (Cancellara Dep. at 288, 290). However, Mr. Cancellara also testified that he "wasn't involved in issuing at that stage any notice to anybody personally." (Cancellara Dep. at 295). At around that time, Biovail also first preserved a backup of its computer system by removing one of the daily backup tapes for each of its servers from the regular rotation.[3] (Cancellara Dep. at 299). The December 12, 2003 backup

---

[3] Biovail created daily backup tapes of its file servers and weekly backup tapes every Friday. The former were recycled every five days, while the latter were retained offsite for four weeks. (Nguyen Dep. at 14-17). In addition, Biovail made monthly backup tapes of its file servers which were retained for one year. (Nguyen Dep. at 15-17; Excerpts of Deposition of James Stewart Cave dated June 7, 2007 ("Cave Dep."), attached as Exh I to Batson Aff. and Exh. 6 to Doron Decl., at 154; Batson Aff., Exh. G). Thus, at any given point Biovail would have had weekly file backups for the

tape of its file servers in Mississagua, Ontario and in Barbados were removed from the rotation and preserved, as was one of five existing daily e-mail backup tapes for each server.[4] (Nguyen Dep. at 19, 24-25; Document Retention Questionnaire at 3; Letter of Andrew J. Levander dated Aug. 9, 2005, attached as Exh. J to Batson Aff., at 2). Backups of the company's New Jersey e-mail and file servers were apparently not preserved until March 2005. (Certification of John F. Ashley dated Dec. 14, 2006 ("Ashley Cert."), attached as Exh. H to Batson Aff., ¶ 2).

A back-up copy of Mr. Melnyk's laptop was first made on August 5, 2005. (Letter of Laurin B. Grollman dated May 12, 2006, attached as Exh. M to Batson Aff.; Letter of Laurin B. Grollman dated May 30, 2006, attached as Exh. L to Batson Aff.). This is significant because, unlike those of other Biovail employees, Mr. Melnyk's e-mails were downloaded directly to his laptop and not preserved on Biovail's Mississauga e-mail server or elsewhere. (Cave Dep. at 125; Nguyen Dep. at 42-43; Melnyk Dep. at 64-65).

---

last month and monthly backups for the last year. Biovail made daily backups of its e-mail servers, which were recycled every 5 days. (Cave Dep. at 73-74; Nguyen Dep. at 10-11).

[4] It is not entirely clear whether a backup of the Barbados server was in fact made in December 2003. The defendants state that a backup tape from each of Biovail's servers, including the one in Barbados, was removed in 2003 in response to the December 3 letter. (Def. Memo. at 5-6). However, at its deposition, Biovail only identified backups of the Barbados server from September 2005 and July 2006. (Excerpts of Deposition of J. Christoper Racich dated May 30, 2007, attached as Exh. N to Batson Aff. ("Racich Dep."), at 58).

Therefore, no copy of e-mails deleted by Mr. Melnyk would have been preserved.[5]

In July 2005, counsel for Biovail rejected a proposed order outlining a comprehensive approach to e-discovery and instead suggested that the parties simply agree which employees' files were to be searched and what search terms were to be used. (Letter of Benjamin E. Rosenberg dated July 29, 2005 ("Rosenberg 7/22/05 Letter"), attached as Exh. 6 to Doron Decl.). Mr. Treppel's counsel demurred, stating that "it is defendants' obligation to simply search its [sic] records and respond to those demands. Plaintiff has no obligation to assist defendants in the process by providing search terms or any other guidance." (Letter of Mark S. Sidoti dated Sept. 12, 2005, attached as Exh. 32 to Affidavit of F. Scott Garley dated Oct. 7, 2005, at 4). When the parties could not reach an accommodation, the plaintiff moved for an order compelling the defendants to preserve all potentially discoverable ESI, answer a number of questions concerning their electronic data management practices, and produce data responsive to certain specific requests.

On February 6, 2006 I issued a Memorandum and Order granting the plaintiff's motion to compel responses to specific discovery requests but denying the plaintiff's request for a preservation

_____

[5] In addition, Mr. Melnyk's laptop seems to have been rebuilt on two occasions during the period in question, in which case data may have been lost. (Nguyen Dep. at 31, 41-42).

order as premature.  Treppel IV, 233 F.R.D. 363.  In addition, I ordered that the defendants "promptly conduct a diligent search, explain the search protocol they use, and produce the responsive documents so located."  Id. at 377.  In response to my Order, Biovail proceeded with the search protocol it had previously proposed, using the search terms (i) Treppel, (ii) Jerry, (iii) Bank of America, (iv) Banc of America, (v) BAS, and (vi) BofA.  Id. at 374; (Ashley Cert., ¶¶ 4-6 & Exh. B; Memorandum of Law in Opposition to Plaintiff's Motion to Compel ("Def. Memo.") at 7-8).  Biovail searched the individual e-mails and files of Mr. Melnyk, Mr. Cancellara, Mr. Howling, and 11 other members of the legal, investor relations, and administrative staffs, as well as shared file drives for the legal and investor relations departments.  (Ashley Cert., ¶¶ 2-6; Def. Memo. at 7).  It did so by accessing the December 2003 backup of the Mississauga e-mail and file servers, the March 2005 backup of the Mississauga and New Jersey e-mail and file servers, and the March 2005 hard drive images for Mr. Melnyk, Mr. Howling, Mr. Cancellara, Dina Khairo, and Mark Thompson.  (Ashley Cert., ¶¶ 2-3).

On February 10, 2006, the plaintiff requested that Biovail expand its search for electronic documents by adding approximately 30 search terms and numerous individual custodians to the original search.  (Letter of Mark S. Sidoti dated Feb. 10, 2006, attached as Exh. 8 to Doron Decl., at 2-3).  Biovail declined to do so on the

grounds that Mr. Treppel's request came too late and was overbroad. (Letter of Neil A. Steiner dated Feb. 17, 2006 ("Steiner 2/17/06 letter"), attached as Exh. 9 to Doron Decl.; Letter of Laurin B. Grollman dated Feb. 23, 2006 ("Grollman 2/23/06 letter"), attached as Exh. 10 to Doron Decl.). Biovail produced the results of its search to the plaintiff on May 5, 2006. After some additional discovery relating to Biovail's preservation of electronic data, discovery closed in December 2007.

The plaintiff then filed the instant motion. He seeks to compel Biovail to search for additional ESI. He also seeks sanctions, alleging that the defendants did not adequately preserve evidence. The defendants oppose both applications, contending that their production was complete and that their steps to preserve evidence were sufficient.

Discussion

A.  Motion to Compel

The plaintiff moves to compel Biovail to restore and search all existing backup tapes of their Mississauga and Barbados servers, as well as any backups of Eugene Melnyk's laptop that have not already been searched.[6] (Pl. Memo. at 1, 12). He asserts that

---

[6] The plaintiff identifies a total of 18 backup tapes that were not searched. (Memorandum of Law in Support of Plaintiff's Motion to Compel Electronic Discovery ("Pl. Memo.") at 11-12). These consist of the April 2004 and June 2005 through March 2006 monthly backups of the Mississauga file server, the April 27, 2004, September 2, 2005, and February 21, 2006 daily backups of the Mississauga e-mail server, the December 2003, September 2005, and

the search Biovail executed was insufficient and may have overlooked discoverable ESI. Though it is theoretically true that each backup tape identified by the plaintiff "contain[s] unique data" (Pl. Memo. at 7), this would only be material if files relevant to this litigation were created subsequent to the date of any backup tape that has already been searched. The only data that would be present on, for instance, the June 2005 Mississauga file backup that is not present on the March 2005 Mississauga file backup would be documents that were created after March 31, 2005.[7] Given that the underlying events in this action took place in the spring of 2002 and Mr. Treppel's initial complaint was filed in May 2003, the chance that additional relevant documents are present on the June 2005 Mississauga backup seems exceedingly remote. The plaintiff has failed to identify any reason to believe that the other backups from 2004 through 2006 would contain any documents relevant to the litigation not already recovered in the December 2003 and March 2005 backups. Absent such a showing, the additional

---

July 2006 backups of the Barbados file server, and the February 21, 2006 backup of the Barbados e-mail server. (Pl. Memo. at 11-12; Document Retention Questionnaire at 9).

   [7] In addition, where two backup tapes have already been searched, the only information contained on an interviewing tape that would be unique is information created after the date of the earlier tape and deleted prior to the date of the later tape. Thus, since Biovail searched its backup tapes for the Mississauga file server for December 2003 and March 2005, the only additional ESI on the April 2004 tape is that which was created after December 31, 2003 and deleted after April 30, 2004 but before March 31, 2005.

discovery requested is likely to be duplicative of discovery already conducted. The burden that searching the backups identified by the plaintiff would impose on the defendants thus outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C)(iii); see also MacNamara v. City of New York, No. 04 Civ. 9216, 2007 WL 3238679, at *1 (S.D.N.Y. Nov. 2, 2007).

There are two exceptions to this analysis. First, while it is improbable that relevant documents stored on a file server such as word processed documents, spreadsheets, or powerpoint presentations would have been created after litigation was commenced, it is more likely that relevant e-mails were. This is illustrated by the fact that among the e-mails produced by Biovail from the mailbox of Mr. Howling were some created in 2005. (Doron Decl., Exh. 12). Therefore, Biovail shall restore and search the backup tapes for the Mississauga e-mail server for April 27, 2004, September 2, 2005, and February 21, 2006.

The second exception consists of the backups of the Barbados server. Biovail's search apparently did not include these backups at all. (Ashley Cert., ¶ 2; Racich Dep. at 58). Since this server was used by Eugene Melnyk's assistant during 2002 and 2003 (Cave Dep. at 43), it may well contain relevant documents and therefore should have been searched. Consequently, Biovail must restore and search the September 2005 backup of the Barbados file server and the February 21, 2006 backup of the Barbados e-mail server using

12

the same criteria that it used to search the Mississauga and New Jersey servers.[8]

B. Sanctions

The plaintiff also moves for sanctions against the defendants, including an adverse inference instruction, for their allegedly inadequate preservation efforts.

1. Biovail's Preservation of Evidence

Biovail's efforts to preserve ESI were clearly inadequate. To begin with, Biovail was tardy in initiating a comprehensive preservation program. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). Thus, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)("Zubulake IV"). In Treppel IV, I noted that Biovail was fully aware of the suit by May 1, 2003, when a Biovail spokesman told the press that the suit was "without merit" and reported the litigation in a filing with the Securities and

_____

[8] As noted above, it is not clear whether a backup of the Barbados server was made in December 2003.  If a December 2003 backup exists, it too must be restored and searched.

13

Exchange Commission shortly thereafter. 233 F.R.D. at 371. Thus, Biovail's obligation to preserve data arose no later than May 2003. While Mr. Melnyk and Mr. Howling were apparently instructed to begin preserving ESI around this time, it is unclear at what point they actually began preserving evidence or what materials they preserved.[9] What is clear is that Mr. Melnyk and Mr. Howling did not inform Mr. Cancellara of what steps they took and that Mr. Cancellara took no action to follow up on his instructions to the two men. (Cancellara Dep. at 288-89). As such, his efforts to preserve ESI were clearly deficient. See Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)("Zubulake V")("[I]t is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched.") (emphasis omitted). Nor did Mr. Cancellara make any effort to ensure that employees other than Mr. Melnyk, Mr. Howling, and himself, such as their support staff, took any steps to preserve relevant information. (Cancellara Dep. at 297). While the defendants aver that only these three were involved in the events from which the lawsuit arises (Def. Memo. at

_____

[9] The plaintiff expresses doubt as to whether Mr. Cancellara ever gave such an instruction (Reply Memorandum of Law in Further Support of Plaintiff's Motion to Compel Electronic Discovery ("Pl. Reply Memo.") at 3-4), but cites no evidence that would call his testimony into question.

11), the plaintiff reasonably suggests that assistants and support staff to these high-level executives were likely to be in possession of some discoverable evidence. (Pl. Memo. at 9). This inference is reinforced by the fact that Mr. Howling apparently took it upon himself to instruct his staff to preserve information (Howling Dep. at 23-25), and that counsel to Biovail later included support staff among the custodians whose e-mails and files were to be searched (Ashley Cert., ¶ 3), suggesting that they thought it at least possible that those individuals would possess discoverable information.[10]

Moreover, irrespective of the instructions given to Mr. Melnyk and Mr. Howling, Biovail failed to institute a full preservation program; specifically, Biovail did not back up its servers until December 2003, seven months after it should have been aware of its obligation to begin preserving data. This failure is most troubling with regard to the failure to preserve the monthly backup tapes that existed when litigation commenced in May 2003. Since Biovail's policy is to retain its monthly backups for one year before overwriting them, as of May 1, 2003, it presumably possessed backups dating back to May 2002, the month in which many of the underlying events at issue in this action ensued. That backup, however, was subsequently overwritten and destroyed.

---

[10] Whether any relevant information was recovered from these users' accounts or files is not apparent from the record.

15

Even after receiving the plaintiff's letter apprising it of its preservation obligations, Biovail still failed to preserve backup tapes that existed in December 2003. Again, given Biovail's backup retention policy, as of December 2003, it would have monthly backup tapes dating as far back as December 2002, a period encompassing the filing of the plaintiff's complaint. However, Biovail apparently allowed those tapes to be overwritten as well, preserving only a single backup tape from December 12, 2003. "As a general rule, [] a party need not preserve all backup tapes even when it reasonably anticipates litigation." Zubulake IV, 220 F.R.D. at 217. However, a party "must retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches." Id. at 218. Thus, Biovail is certainly right that it need not have retained "every backup in existence at the time [its] preservation obligation began" and "every backup created thereafter." (Def. Memo. at 15). For instance, Biovail need not have retained, as the plaintiff suggests, all five daily e-mail backups that existed on December 12, 2003, as the data on those tapes were unlikely to have changed significantly in the 24 hours between the creation of each tape. For the same reason, Biovail was not required to preserve every daily backup of its file servers for the month of December 2003. However, it is equally clear that Biovail should have retained the monthly backup tapes of the relevant servers from the previous year, since these were quite

likely to contain files that were later deleted.

In addition, the unique procedure by which Mr. Melnyk's e-mail was downloaded to his personal laptop and then deleted from Biovail's servers resulted in his e-mail not being preserved on the backup tapes at all.  Mr. Melnyk states that he began preserving e-mails when Biovail first received inquiries from the Ontario Securities Commission, but he is vague about when that occurred. (Melnyk Dep. at 75-77).  The defendants claim in their papers that it was "in the same time frame" as the commencement of this litigation.  (Def. Memo. at 5).  As discussed above, Mr. Melnyk's laptop was not backed up until August 2005, over two years after the complaint was filed.  (Racich Dep. at 22).  Thus, it is possible that relevant e-mails were deleted after the defendants became aware of this litigation and prior to the time Mr. Melnyk began preserving e-mail.  Indeed, the plaintiff points to a number of e-mails to or from Mr. Melnyk that were produced by other individuals at Biovail but not from his laptop, a number of which post-date May 2003.  (Melnyk Dep. at 326, 380, 389, 415, 490, 494, 530-31, 726, 731).

### 2. Violation of the Discovery Order

The plaintiff contends that sanctions are warranted on two bases.  First, he argues that the defendants are subject to sanctions for violation of the order in Treppel IV.  "Where a party violates an order to preserve evidence or fails to comply with an

order compelling discovery because it has destroyed the evidence in question, it is subject to sanctions under Rule 37(b) of the Federal Rules of Civil Procedure for failure to comply with a court order." In re WRT Energy Securities Litigation, 246 F.R.D. 185, 194 (S.D.N.Y. 2007); see also Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106-07 (2d Cir. 2002); Metropolitan Opera Association v. Local 100, Hotel Employees & Restaurant Employees International Union, 212 F.R.D. 178, 219-21 (S.D.N.Y. 2003). In Treppel IV, I ordered that the Biovail defendants conduct a search, explain their search protocol, and produce responsive documents. 233 F.R.D. at 377. The plaintiff argues that they failed to do so. (Pl. Memo. at 12). The plaintiff does not provide support for this allegation, nor does there appear to be any basis for it. Almost immediately after the issuance of the order in Treppel IV, Biovail proceeded with the search that it proposed earlier and informed the plaintiff that it had done so. (Steiner 2/17/06 letter; Grollman 2/23/06 letter). The plaintiff had earlier refused to comment on the search criteria provided by Biovail. Biovail produced the results of the search to Mr. Treppel on May 5, 2006. That search was deficient in that it failed to include backup tapes for the Barbados servers and certain backups for the Mississauga e-mail server, and relief has been provided for those omissions. Since the plaintiff has failed to identify any other specific omissions, no other sanction is necessary or

appropriate.

        3. Adverse Inference

    The plaintiff also seeks sanctions, including an adverse
inference instruction, for the alleged spoliation of evidence.
"Even in the absence of a discovery order, a court may impose
sanctions on a party for misconduct in discovery under its inherent
power to manage its own affairs." Residential Funding, 306 F.3d at
106-07, accord WRT Energy Securities Litigation, 246 F.R.D. at 194;
Metropolitan Opera, 212 F.R.D. at 220.  "Spoliation is the
destruction or significant alteration of evidence, or the failure
to preserve property for another's use as evidence in pending or
reasonably foreseeable litigation." West v. Goodyear Tire & Rubber
Co., 167 F.3d 776, 779 (2d Cir. 1999).  The spoliation of evidence
"relevant to proof of an issue at trial can support an inference
that the evidence would have been unfavorable to the party
responsible for its destruction." Kronisch v. United States, 150
F.3d 112, 126 (2d Cir. 1998). However, "the determination of an
appropriate sanction for spoliation, if any, is confined to the
sound discretion of the trial judge, and is assessed on a
case-by-case basis." Fujitsu, 247 F.3d at 436 (internal citation
omitted).

    "[A] party seeking an adverse inference instruction based on
the destruction of evidence must establish (1) that the party
having control over the evidence had an obligation to preserve it

at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding, 306 F.3d at 107 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001)); accord Zubulake IV, 220 F.R.D. at 220.  The party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence.  See Byrnie, 243 F.3d at 109.  In general, the adverse inference instruction is an extreme sanction and should not be imposed lightly.  Zubulake IV, 220 F.R.D. at 220.

### a. Obligation to Preserve Evidence

As discussed above, the defendants' duty to preserve evidence arose no later than May 2003.  As their efforts to preserve ESI after that date were inadequate, this element is clearly established.

### b. Culpability

Biovail's failure to preserve backup tapes until December 2003 was, at a minimum, negligent.  Though Biovail knew of the pending litigation, it made no effort to prevent any of the backups that existed in May 2003 from being reused.  In particular, it allowed backup tapes from May 2002 to be overwritten.  However, while "the law is now clear that any back up tapes containing the documents of a key player must be preserved and accessible," Toussie v. County

of Suffolk, No. CV 01-6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007), this was a "grey area" in 2003.  Zubulake IV, 220 F.R.D. at 220.  Thus, Biovail's failure to preserve the backup tapes at that time was "merely negligent."  Id.; see also Toussie 2007 WL 4565160, at *8.[11]

Biovail's failure to preserve existing backup tapes after December 2003 is much less excusable.  By that time, the defendants not only had the benefit of the Zubulake IV decision and its progeny to clarify their legal obligation to preserve backups, but they  were also apprised in writing by plaintiff's counsel of the need to preserve relevant electronic information.  Nonetheless, Biovail instead preserved only a single backup of the file and e-mail servers from December 2003, allowing backup tapes dating as far back as December 2002 to be destroyed.  This is sufficient to constitute gross negligence or recklessness.  See, e.g., Zubulake IV, 220 F.R.D. at 221 (defendant's failure to preserve backup tapes from critical period after defendant was "unquestionably on notice of its duty to preserve" was grossly negligent); Doe v. Norwalk Community College, No. 3:04-cv-1976, 2007 WL 2066497, at *6 (D. Conn. July 16, 2007)(finding gross negligence where there was "no

---

[11] In contrast, "the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent." Heng Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005).  Here, Biovail seems to have attempted to put into place some form of litigation hold, however inadequate it may have been, in the form of Mr. Cancellara's instructions to Mr. Melnyk and Mr. Howling.

evidence that the defendants did anything to stop the routine destruction of the backup tapes after [their] obligation to preserve arose"); Golia v. Leslie Fay Co., 01 Civ. 1111, 2003 WL 21878788, at *8-9 (S.D.N.Y. Aug. 7, 2003) (defendant's failure to prevent employee from destroying documents upon being terminated was, at the very least, grossly negligent); Pastorello v. City of New York, No. 95 Civ. 470, 2003 WL 1740606, at *11-12 (S.D.N.Y April 1, 2003)(loss of data due to unfamiliarity with record-keeping policy by employee responsible for preserving document was grossly negligent).

Finally, Biovail was at least negligent in taking inadequate measures to preserve the ESI of key executives and their support staff. As described above, although Mr. Cancellara testified that he instructed Mr. Melnyk and Mr. Howling to retain e-mails and files in May 2003, neither Mr. Melnyk nor Mr. Howling could remember when they in fact began to preserve evidence. Nor could they or Mr. Cancellara say what steps had been taken to preserve data, and it is unclear whether Mr. Cancellara or anyone else at Biovail took steps to ensure that files were being preserved, even after December 2003.[12] (Cancellara Dep. at 295-96). Moreover, none

---

[12] The plaintiff suggests that this lack of clarity is due at least in part to the failure of the defendants to produce for deposition the individual directly in charge of preserving and producing electronic discovery materials, Dina Khairo, Biovail's Director of Legal and Regulatory Affairs. (Pl. Reply Memo. at 4-5; Cancellara Dep. at 297-98; Def. Memo. at 6).

of the key employees' computers was backed up until 2005, almost two years after Biovail received the plaintiff's letter.  As noted above, this is of particular concern with respect to Mr. Melnyk, whose downloaded e-mails were not preserved anywhere else in the system.  Additionally, support staff to Mr. Melnyk and Mr. Cancellara were never instructed to preserve files.

In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence.  Residential Funding, 306 F.3d at 108.  Thus, because Biovail was at least negligent, Mr. Treppel has satisfied his burden with respect to the second prong of the spoliation test.  See Zubulake IV, 220 F.R.D. at 221.

c.  Relevance

When evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions, and therefore relevant.  Residential Funding, 306 F.3d at 109.  By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions.  While it is true that under certain circumstances "a showing of gross negligence in the destruction or untimely production of evidence" will support the same inference, id. (citing Reilly v. NatWest Group, Inc., 181 F.3d 253, 267-68 (2d Cir. 1999), the circumstances here do not warrant such a finding, as the defendants' conduct "does not rise to the egregious level

23

seen in cases where relevance is determined as a matter of law." Toussie, 2007 WL 4565160, at *8 (declining to award adverse inference even though defendant failed to implement litigation hold and its "foot dragging" delayed litigation); cf. Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1979) (finding preclusion of evidence justified where plaintiff's gross negligence froze litigation for four years); Cordius Trust v. Kummerfeld, No. 99 Civ. 3200, 2008 WL 113664, at *4 (S.D.N.Y. Jan. 11, 2008)(defendant's "long-term and purposeful evasion of discovery requests," standing alone, was sufficient to support a finding of relevance for purpose of imposing sanctions).

As the defendants' destruction of evidence appears to have been negligent but not willful, Mr. Treppel "must demonstrate that a reasonable trier of fact could find that the missing [evidence] would support [his] claims." Zubulake IV, 220 F.R.D. at 221; see also Residential Funding, 306 F.3d at 109 ("[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.")(internal quotation marks, citation, and alterations omitted); Zubulake V, 229 F.R.D. at 431 ("[T]he concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."). Such a showing can be made

24

by pointing to extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to the movant. Residential Funding, 306 F.3d at 109; Byrnie, 243 F.3d at 109-10 (relevance of missing interview notes could be inferred from weakness of defendant's purported reasons for not hiring plaintiff, suggesting that the reasons were a "pretext [for] the real explanation that would be disclosed by the [notes]"); Great Northern Insurance Co. v. Power Cooling, Inc., No. 06-CV-874, 2007 WL 2687666, at *11 (E.D.N.Y. Sept. 10, 2007); Reino de Espana v. American Bureau of Shipping, No. 03 Civ. 3573, 2007 WL 1686327, at *6 (S.D.N.Y. June 6, 2007); Heng Chan, 2005 WL 1925579, at *8; Zubulake V, 229 F.R.D. at 427-29 (relevance of deleted e-mails inferred from other e-mails that had been recovered and eventually produced); Barsoum v. New York City Housing Authority, 202 F.R.D. 396, 400-01 (S.D.N.Y. 2001)(notes of meeting between employment discrimination plaintiff and supervisor suggesting non-discriminatory motive for adverse action tended to show that audiotape of meeting destroyed by plaintiff would have been unfavorable to her). "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Zubulake IV, 220 F.R.D. at 221 (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 77 (S.D.N.Y. 1991)).

Mr. Treppel has failed to make such a showing.  Indeed, there is little extrinsic evidence demonstrating that any pertinent documents at all were destroyed, let alone documents favorable to the plaintiff.  Rather, it is more the case that "the only evidence that Plaintiff has adduced suggesting that the unproduced [discovery] would be unfavorable to Defendants is the non-production itself."  Mitchell v. Fishbein, No. 01 Civ. 2760, 2007 WL 2669581, at *5 (S.D.N.Y. Sept. 13, 2007)(quoting Cortes v. Peter Pan Bus Lines, Inc., 455 F. Supp. 2d 100, 103 (D. Conn. 2006)).  Mr. Treppel relies on generalized assertions such as that "it is highly improbable that relevant documents regarding Treppel were not created between December 2002 and December 2003" (Pl. Memo. at 13) and that the defendants' failure to suspend overwriting of e-mail backups "almost certainly resulted in spoliation of significant relevant evidence."  (Pl. Memo. at 14). Such assertions are insufficient to establish relevance.  See Great Northern, 2007 WL 2687666, at *12 (adverse inference not warranted without showing that missing evidence was favorable to plaintiff); Reino de Espana, 2007 WL 1686327, at *8 (adverse inference inappropriate because "[t]here is no evidence that [party seeking sanctions] asked any deponent whether lost or destroyed e-mails included information concerning its proposed adverse inferences"); Sovulj v. United States, No. 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y Sept. 20, 2005)(same result where any assertion that

missing evidence was relevant was "pure speculation"); Zubulake IV, 220 F.R.D. at 221 (same result where there was no evidence that missing e-mails were "likely to support [plaintiff's] claims"); Turner, 142 F.R.D. at 77 (in personal injury action regarding motor vehicle accident, plaintiff not entitled to adverse inference where there was "no evidence that the destroyed records would have shown whether the brakes were in good working order").

"The burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." Heng Chan, 2005 WL 1925579, at *7; see also Residential Funding, 306 F.3d at 109; Kronisch, 150 F.3d at 128 ("[To] hold[] the prejudiced party to a strict standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction."). Thus, "it is not incumbent upon the plaintiff to show that specific documents were lost. It would be enough to demonstrate that certain types of relevant documents existed and that they were necessarily destroyed by the operation of the autodelete function on Biovail's computers or by other features of its routine document retention program." Treppel IV, 233 F.R.D. at 372.

The plaintiff argues that the existence of a number of e-mails that were apparently deleted by Mr. Melnyk but recovered from the systems of other custodians establishes that relevant documents were lost.  In particular, the plaintiff proffers a May 10, 2002 e-mail from Mr. Melnyk to Mr. Howling requesting a picture of the plaintiff, and a May 17, 2002 e-mail from Mr. Melnyk asking for Mr. Treppel's cell phone number.  (E-mails from Eugene Melnyk dated May 10, 2002 and May 17, 2002, attached as Exh. O to Batson Aff.; Pl. Memo. at 10-11).  The defendants argue that all but two e-mails were from a period that pre-dates any preservation obligation on the part of Mr. Melnyk, and that the two e-mails identified by the plaintiff are only "tangentially relevant."  (Def. Memo. at 12 n.6).

The existence of those e-mails does suggest that additional relevant discoverable materials may be present on Mr. Melnyk's laptop that were neither preserved by him nor backed up in 2005. While almost all of the e-mails were created before the obligation to preserve arose, this does not rule out the possibility that other relevant e-mails may have been deleted from Mr. Melnyk's laptop after that date.

It seems quite possible, and even likely, that documents were destroyed because Biovail failed to suspend its backup overwriting in a timely manner and failed to put into place an adequate

28

litigation hold.   Nevertheless, the plaintiff is unable to demonstrate that any single document, or even any type of document, that was destroyed would have been favorable to him.   Even the two e-mails identified by Mr. Treppel from 2003 are neither particularly significant nor apparently favorable to him.   Thus, they are insufficient to establish relevance for the purposes of imposing an adverse inference. The motion for an adverse inference instruction is therefore denied.

    C.   Other Remedies

    While an adverse inference instruction is not justified here, other measures to remedy Biovail's deficient preservation efforts may be appropriate.   See, e.g., Toussie, 2007 WL 4565160, at *9-10 (finding adverse inference not warranted, but awarding costs to moving party); Great Northern, 2007 WL 2687666, at *12-14 (finding adverse inference not warranted, but precluding certain evidence from being introduced at trial); Reino de Espana, 2007 WL 1686327, at *8 (awarding costs).   In general, a court "must determine the appropriate sanction based on the relative fault of the party against whom sanctions are sought and the prejudice suffered by the party seeking sanctions."   Klezmer v. Buynak, 227 F.R.D. 43, 51 (E.D.N.Y. 2005).   Moreover, "[t]rial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing -- a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case."

Reilly, 181 F.3d at 267; see also Fujitsu, 247 F.3d at 436 ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.") (internal citation omitted).  Here, in addition to searching backups of the Barbados and Mississauga servers as indicated above, the plaintiff shall be permitted to undertake, at the defendants' expense, a thorough forensic examination of Mr. Melnyk's laptop in an effort to recover additional relevant e-mails that were deleted by Mr. Melnyk.  If it becomes necessary to undertake additional discovery that the plaintiff would not otherwise have conducted to obtain the equivalent of any destroyed evidence, the plaintiff may make an application for costs at that time.

Conclusion

    The defendants failed to take adequate measures to prevent the destruction of discoverable materials.  Accordingly, the plaintiff is entitled to a remedy.  His application for an adverse inference instruction as to the missing evidence is denied, however, as he is unable to demonstrate the likelihood that any evidence that was destroyed would have supported his claims.  The plaintiff is entitled to a forensic search of Mr. Melnyk's laptop computer at the defendants' expense.  Within 10 days, the defendants shall turn over Mr. Melnyk's computer to the plaintiff's forensic expert.  Any evidence recovered from the computer shall be reviewed first by the

defendants so that they may assert any applicable claims of privilege and then turned over to the plaintiff, along with a privilege log. In addition, the plaintiff's motion to compel is granted to the extent that Biovail shall restore and search the April 27, 2004, September 2, 2005, and February 21, 2006 backup tapes from the Mississauga e-mail server, the February 21, 2006 backup tape from the Barbados e-mail server, and the December 2003 and September 2005 backup tape from the Barbados file server. In all other respects, the plaintiff's motion is denied. Within 10 days, counsel shall submit a proposed schedule for completing the discovery authorized by this Order.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       April 2, 2008

Copies mailed this date:

James A. Batson, Esq.
Christine A. Palmieri, Esq.
Liddle & Robinson, LLP
800 Third Avenue
New York, New York 10022

Mark S. Sidoti, Esq.
R. Scott Garley, Esq.
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119

31

Marc E. Kasowitz, Esq.
Michael J. Bowe, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, New York 10019-6799

Andrew J. Levander, Esq.
Neil A. Steiner, Esq.
Dechert, LLP
30 Rockefeller Plaza
New York, New York 10112

Peter E. Fleming, Esq.
T. Barry Kingham, Esq.
Curtis, Mallet-Prevost, Colt & Mosle, LLP
101 Park Avenue
New York, New York 10178